[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 209 
Lifestar Response of Alabama, Inc., d/b/a Care Ambulance ("Lifestar") appeals from an order entered on July 31, 2003, by Judge Charles Price (1) overruling Lifestar's motion to set aside a default judgment entered in the case styled "Mildred Lemuel,administratrix of the estate of Darnell Eugene Lemuel, deceased,and Mildred Lemuel, plaintiffs v. Care Ambulance Service ofAlabama, Inc., a corporation, etc.," and (2) granting the plaintiff's motion to amend that judgment to substitute Lifestar for Care Ambulance Service of Alabama, Inc. ("Care"). We affirm.
Because the convoluted facts involved in this case control our disposition of the appeal, we recite them in detail.
On November 19, 1998, Lifestar and Care entered into an "Asset Purchase Agreement" pursuant to which Lifestar purchased all of the assets of Care. Care was in the business of operating a basic and advanced life-support ambulance and medical-transportation service. Lifestar identified itself in the agreement as an Alabama corporation having its principal place of business in Holtsville, New York, and Care identified itself as an Alabama corporation having its principal place of business at 939 South Perry Street, Montgomery, Alabama 36104. That location was conveyed to Lifestar in the transaction. Other features of the transaction pertinent to the issues in this case were that "the corporate name `Care Ambulance Service of Alabama, Inc.' and any derivative thereof in the State of Alabama and East of the Mississippi River and any and all fictitious names used by [Care] and . . . telephone numbers and facsimile numbers or pager numbers utilized by [Care]" were sold to Lifestar, and Care agreed to "change its corporate name to a name dissimilar" and to discontinue using the name Care Ambulance Service in the State of Alabama, except as might be required in order to collect accounts receivable generated before the closing of the asset-purchase transaction. Lawrence Branch, a "key employee" who was "in charge of running the day-to-day operation" of Care, was to stay on as an employee of Lifestar for two years.
Care ceased business operations and Lifestar assumed the operation of the ambulance service. Lifestar continued to use *Page 210 
the tradename "Care Ambulance Service," advertising itself by that name in the Montgomery area telephone directory, also using the shorter tradename, "Care Ambulance."
On November 8, 2000, Darnell Eugene Lemuel became ill at his home in Montgomery. His wife, Mildred Lemuel, and their daughter, Naquita McDonald, were with him. Late that night Ms. McDonald telephoned emergency "911" and within two or three minutes two employees of "Care Ambulance" arrived. The circumstances of what they did, or omitted to do, on that occasion will be discussed later in this opinion; eventually they transported Mr. Lemuel to Baptist Medical Center South. His condition was critical when he arrived at the hospital, and he was pronounced dead at that facility on November 10.
On November 7, 2002, Ms. Lemuel, both as the administratrix of Mr. Lemuel's estate and in her own right, sued "Care Ambulance Service of Alabama, Inc." and the two employees who had attended to Mr. Lemuel, designated by the fictitious names "ABC" and "DEF." The complaint alleged that Care, "a corporation registered in the State of Alabama with principal place of business at 939 South Perry Street in Montgomery, Alabama," had been contacted after Mr. Lemuel had "passed out" in his house and that, although the responding employees were informed that he was on medication for high blood pressure and diabetes and observed that he was drifting in and out of consciousness, they "made no effort to provide appropriate life support measures." The complaint charged that the two employees breached their duty to provide emergency medical treatment in various specified respects and that Care had failed to employ and dispatch properly qualified personnel. The summons directed service on Care at its South Perry Street address, to Branch's attention. Deputy Glenn Mannich of the Montgomery Sheriff's Department delivered the summons and complaint to the Perry Street address on January 7, 2003, and Karen Robertson, employed by Lifestar as its human resource manager, accepted the service and signed Deputy Mannich's "service log." At the hearing conducted on July 22, 2003, on Lifestar's motion to set aside the default judgment, Deputy Mannich testified that he had served "eight or ten papers" on Care Ambulance Service at the Perry Street address during the preceding four years and that Robertson was "one of the people that does accept the papers for the company." He confirmed that she had previously signed for the papers on behalf of "Care Ambulance Service of Alabama, Inc."
In an affidavit dated July 16, 2003, in support of Lifestar's motion to set aside the default judgment and its objection to the plaintiff's motion to amend the judgment, Robertson stated that she had no personal recollection of the delivery of the summons and complaint but stated:
 "If I was personally delivered a copy of the Summons and Complaint in the Lemuel lawsuit, I would not have read the Complaint, nor noted the identity of the person or company being served. I would have given the Complaint to Vanessa Hill, our billing clerk, to forward to the home office of Lifestar along with other business documents usually transmitted to our home office."
Lifestar has not undertaken to account otherwise for the disposition of the summons and complaint, although its attorney acknowledged at the July 22 hearing: "I'm not going to say the ball didn't get dropped here as far as wherever this suit went," and Lifestar states in its principal brief to this Court that "[a]s far as can be *Page 211 
determined, the Complaint served upon Karen Robertson was transmitted to the home office of Lifestar, but from there it is unclear as to its routing." (Lifestar's brief, p. 39.)
No appearance was filed on behalf of Care, and the plaintiff's attorney, Timothy C. Halstrom, applied for a default judgment. On May 16, 2003, Judge Price signed an order scheduling "a hearing on default damages" for May 28. According to Judge Price's subsequent order of July 31, 2003, notice of that hearing was issued by the circuit clerk to Care at its Perry Street address. (The order scheduling that hearing bears the notation at its bottom "cc: Timothy Halstrom, Esq.; Lawrence S. Branch, Pro Se.") No one appeared at the May 28 hearing except Halstrom, Ms. Lemuel, McDonald, and Dallas Johnson, an expert witness. Testimony was given by Ms. Lemuel, McDonald, and Johnson, and numerous exhibits were introduced. At the conclusion of the hearing Judge Price entered a default judgment in favor of the plaintiff in the amount of $5,000,000.
On June 3, 2003, Halstrom received a telephone call from an individual identifying himself as Bob Fraulich, a representative of Lifestar. According to Halstrom's representations made to Judge Price without objection at the July 22 hearing on the motion to set aside the default judgment, Fraulich was calling from New York, was aware of the default judgment against Care, and explained that "`Care is not that company. We are Lifestar Response Corporation Alabama, Inc., doing business as Care Ambulance Service. So you have got the wrong one, you can't collect the judgment.'" In its brief to this Court, Lifestar states, "Actually what was said by Lifestar's representative was the Default Judgment was taken against the wrong party, not that Lemuel had sued using the `wrong name.'" (Lifestar's brief, p. 9.)
Based on that information, Halstrom filed a motion, reciting the content of that telephone conversation and including other information, to amend the judgment to operate against "Life Star Response Corp. of Alabama d/b/a Care Ambulance Service." Copies of the motion were sent by mail to Fraulich and to "Life Star Response Corp. of Alabama d/b/a Care Ambulance Service." The motion mailed to Lifestar was duly received at the Perry Street address the following day.
On June 12 attorney Jack B. Hinton, Jr., entered his notice of appearance on behalf of Care. The following day Halstrom faxed to him a copy of the motion to amend the judgment. Also on that day, Judge Price entered an order setting Halstrom's motion for hearing on June 26, with copies to Halstrom and Hinton. On June 23, 2003, attorney Burt P. Taylor filed a notice of appearance on behalf of "Lifestar Response of Alabama, Inc., d/b/a Care Ambulance Service," and a motion seeking a continuance of the June 26 hearing on the basis that he and his client "just recently learned" of the default judgment and the motion to amend. On June 24 Taylor filed a "corrected motion to continue hearing," reidentifying his client as "Lifestar Response of Alabama, Inc., d/b/a Care Ambulance," combining "Life" and "Star" in the name of the corporate entity and dropping "Service" at the end of its tradename. Halstrom filed an amendment to his motion, asking that the defendant be redesignated as "Lifestar Response of Alabama, Inc., d/b/a Care Ambulance Service." Judge Price rescheduled the hearing on all pending motions for July 14; that hearing was ultimately conducted on July 22.
On July 18, 2003, Care filed a motion to set aside the default judgment pursuant to Rule 55(c), Ala. R. Civ. P., and Rule *Page 212 
60(b)(1), (4), and (6), Ala. R. Civ. P.; on that same day, Lifestar filed its "objection to plaintiff's motion to amend judgment and motion to set aside default judgment." Care asserted in its motion that Lifestar had faxed to it on May 29 a copy of Judge Price's May 16 order setting the hearing on damages for May 28 and that, upon receiving that order, Care had faxed a copy of it to its legal counsel in California. Care alleged that it had a meritorious defense because, among other things, "it was not the entity involved in the alleged medical malpractice made the subject of this suit." Care asserted that no unfair prejudice would result to the plaintiff if the default judgment was set aside and disclaimed any culpable conduct on its part, pointing out that its corporate name had been sold to Lifestar and that "[t]he first information made available to the former `Care Ambulance Service of Alabama, Inc.,' was at or around the time of the hearing on the default judgment." Claiming alternatively that the default judgment was void as to it because of lack of service, Care attached the affidavit of Branch, who attested that Care had not operated any ambulance companies after the sale of the service to Lifestar and that he was not at the Perry Street address on the date the summons and complaint were served, being then at his residence in Desert Hot Springs, California. He stated that he had not authorized Robertson to accept any service on his behalf.
Lifestar asserted in its motion that its employees rendered no medical treatment to Mr. Lemuel because "Montgomery Fire Department Medics were on the scene at the time of arrival by the Lifestar ambulance and provided all medical care during transport in connection with medical personnel on staff at the hospital." Lifestar argued that the default judgment was void because Robertson was not authorized to accept service on behalf ofCare. In its only reference to Rule 55(c), Ala. R. Civ. P., Lifestar argued that the default judgment was due to be set aside because:
 "Care Ambulance Service of Alabama, Inc., was not the entity performing the acts made the basis of Plaintiff's Complaint and, therefore, cannot be held legally accountable for said alleged wrongful conduct. The ambulance transportation provided plaintiff's decedent was through Lifestar not the named defendant. The named defendant has a very meritorious defense to the Plaintiff's claims. To enforce a default judgment against Care Ambulance would be manifestly unjust."
Lifestar contended that the judgment could not be amended as the plaintiff was requesting because "Care Ambulance Service of Alabama, Inc., is not a tradename being used by Lifestar." Lifestar argued that the plaintiff had not sued a tradename but, rather, "[t]he face of the Complaint clearly reflects suit against an existing Alabama corporation and does not designate the nature of the suit as being related to a Complaint against the entity doing business as `Care Ambulance.'" As evidentiary support, Lifestar annexed the affidavits of Robertson and Keith Bryan, its regional vice president.
Concerning the incident involving Mr. Lemuel, Bryan's affidavit states:
 "I have reviewed the records of Lifestar and determined Darnell Lemuel was transported by a Lifestar ambulance on November 8, 2000, from his residence at 3345 S. Perry Street, to [Baptist Medical Center]-South. Attached is the Statistical Data Report, Baptist Health Admissions Fact Sheet, and Run Report signed by the Lifestar employees making the run. The Lifestar employees did not render EMT medical services to Mr. Lemuel. The Montgomery Fire *Page 213 
Department Fire Medics were on the scene at the time of arrival, accompanied Mr. Lemuel in the transport to the hospital, and provided all medical treatment to the patient in conjunction with medical personnel at the hospital with whom they were in contact.
 "Pursuant to Ordinance 25-98, City of Montgomery, Montgomery Fire Department Fire Medics are in charge at the scene in all matters concerning patient care and patient transport. The protocol requires an ambulance crew to work under the direction of the officer or fire medic in command of a scene where care is being provided by fire department personnel. This protocol was followed by the Lifestar ambulance crew in connection with the transport of Mr. Lemuel.
 "The Lifestar ambulance crew did not perform the medical care criticized by the Plaintiff in the Lemuel lawsuit described above, which is alleged to have caused the death of Mr. Lemuel on November 10, 2000, two days following his transport to the hospital by the Lifestar ambulance."
The referenced "Statistical Data Report, Baptist Health Admissions Fact Sheet, and Run Report" have been closely examined, and none contain any express reference to the presence on the scene of any Montgomery Fire Department personnel.
On July 22, 2003, Judge Price conducted a hearing on all pending motions. Halstrom, Hinton, and Taylor were present. The only witness called was Deputy Mannich. Hinton argued on behalf of Care that it existed only "as a shell" after it sold its entire business to Lifestar "lock, stock, and barrel." He acknowledged that by the time the Lemuel action was filed, Branch had relocated to California and Care had not thereafter maintained in Alabama a registered office or a resident registered agent for service, as required by § 10-2B-5.01, Ala. Code 1975. Hinton argued that Care had a meritorious defense inasmuch as it had not been involved in any way in the response to the Lemuel home.
Taylor argued that because Care Ambulance Service of Alabama, Inc., was nonetheless "still a valid entity" the summons and complaint directed to it was ineffectual as service on or notice to Lifestar. Taylor argued that although Lifestar had been the entity that did respond to the emergency call for medical assistance at the Lemuel residence, it had not provided any medical care to Mr. Lemuel. Taylor asserted:
 "[T]he care that was provided to Mr. Lemuel, whatever that care may have been, was provided by the Montgomery Fire Department medic department. They were on the scene. They're the ones that called us. They're the ones that rode in the ambulance with the patient to the hospital. They're the ones by ordinance that have exclusive control and jurisdiction over the situation."
Judge Price responded to that argument to point out that the testimony at the May 28, 2003, hearing had been to the contrary, prompting Taylor to insist "[b]ut they are wrong — that is what I am saying." When Judge Price noted that Lifestar had had the opportunity to appear at the May 28 hearing and present its defense, Taylor insisted "[b]ut we weren't sued. And we weren't put on notice, which is the whole point."
Concerning his motion to amend the judgment, Halstrom argued that "Care Ambulance Service" was a tradename under which Lifestar operated and that, under all the circumstances, the judgment against Care Ambulance Service of Alabama, Inc., should be recognized as a judgment against Lifestar. He relied on Ex *Page 214 parte CTF Hotel Management Corp., 719 So.2d 205 (Ala. 1998), as his principal authority. Taylor responded that the defendant inEx parte CTF was designated by a tradename under which the entity served with process did business, whereas here Lifestar had "never done business as Care Ambulance Service of Alabama, Inc." Taylor argued that the whole purpose of service is "notice" and that because Lifestar was not properly named it was not "put on notice."
Halstrom pointed out that the complaint clearly described the particular ambulance service involved in the incident and that Lifestar would have known from that description that it had provided that service. Halstrom proved that in an action filed in the Montgomery Circuit Court five months before the Lemuel action, the name of the defendant served had been identical to the name of the defendant served in this case, and Lifestar had answered the complaint, acknowledging that it was in fact the entity being sued. Specifically, in that other action another wrongful-death claim was brought against "Care Ambulance Service of Alabama, Inc.," and the summons directed service on Branch at the Perry Street address. Service by certified mail was effected on Vanessa Hill at that address. On July 10, 2002, Lifestar filed an answer, introduced by the statement: "Comes now the Defendant, Life Star Response Corp. of Alabama, d/b/a Care Ambulance Service (incorrectly designated as Care Ambulance Service of Alabama, Inc. in plaintiff's Complaint). . . ."
In his order of July 31, 2003, Judge Price summarized the testimony he had heard at the July 22 hearing on damages, reviewed the pertinent procedural events of the case, and held that it should have been apparent to the on-site personnel of Lifestar upon receipt of the summons and complaint in the Lemuel action that the complaint "stated a claim for damages against the entity doing business under the name `Care Ambulance Service' based on the alleged wrongful acts of the employees of `Lifestar.'" He stated that Lifestar was aware of its obligation to answer the complaint designating the wrongdoer as Care Ambulance Service of Alabama, Inc., as evidenced by the answer it filed in a prior action and the fact that it operated under the tradename "Care Ambulance Service." Judge Price concluded that Lifestar had received actual notice of a claim against it asserting negligence of its employees and simply "took a calculated risk in not appearing to defend." Judge Price expressed his opinion that the default was the result of culpable conduct by Lifestar, pointing out that Lifestar had misrepresented itself to the courts in Montgomery County by names other than its true legal name. He denied the motions to set aside the default judgment and granted the motion to amend it, directing the court clerk to substitute "Lifestar Response of Alabama, Inc., d/b/a Care Ambulance Service" for "Care Ambulance Service, Alabama, Inc." in the default judgment.
Care has not appealed from Judge Price's order. Lifestar appeals, asserting (1) that the default judgment was void because service of process was insufficient as to both it and Care; (2) that if the judgment was not void, it should have been set aside; (3) that if the judgment was not void and not otherwise due to be set aside, it was error for Judge Price to substitute Lifestar as the judgment debtor; and (4) that the $5,000,000 default judgment was excessive.
We review de novo a trial court's ruling on a Rule 60(b)(4), Ala. R. Civ. P., motion to set aside a default judgment as void.Northbrook Indem. Co. v. Westgate, Ltd., 769 So.2d 890 (Ala. 2000). We also review de novo a ruling amending a default *Page 215 
judgment to rename the judgment debtor. Ex parte CTF Hotel Mgmt.Corp., 719 So.2d at 207. In reviewing a trial court's denial of a motion to set aside a default judgment under other subdivisions of Rule 60(b) or under Rule 55(c), we consider whether the trial judge exceeded his or her discretion. Triple D Trucking, Inc. v.Tri Sands, Inc., 840 So.2d 869 (Ala. 2002).
We conclude that Lifestar has not shown that it is entitled to have the default judgment set aside as void for lack of jurisdiction. "The purpose of service is to notify the defendant of the action that is being brought against him." Hughes v.Cox, 601 So.2d 465, 470 (Ala. 1992). See also Ex parte CTFHotel Mgmt. Corp., 719 So.2d at 208; Goodall v. PonderosaEstates, Inc., 337 So.2d 726, 728 (Ala. 1976).
 "We affirmatively hold that a judgment entered against a trade name is a judgment against the individual doing business under that trade name, at least so long as the individual was personally served with the complaint. Absent a statute to the contrary, an individual has the right to be known by any name that he chooses, and a judgment entered for or against that individual in either an assumed name or a trade name is valid."
Hughes v. Cox, 601 So.2d at 471.
In Ex parte CTF, supra, the plaintiff sued an entity named in the complaint as "Stouffer Riverview Plaza Hotel," seeking damages for an incident described in the complaint as having occurred on a specific date when the hotel's manager had had the plaintiff arrested for allegedly refusing to pay his bill. The hotel was owned by Riverview Plaza Associates, Inc. ("Riverview Plaza"), but was operated by Stouffer Hotel Management Corporation ("Stouffer Hotel Management") pursuant to a contract between Stouffer Hotel Management and Riverview Plaza. The hotel's manager was an employee of Stouffer Hotel Management, and the complaint was served on an individual who worked under the supervision of Stouffer Hotel Management. "For reasons that are not fully apparent from the record, neither Stouffer Hotel Management nor Riverview Plaza answered the complaint."719 So.2d at 206-07. A default judgment was entered against "Stouffer Riverview Plaza Hotel," which was not a legal entity. Rather, it was a tradename under which Riverview Plaza owned the hotel and Stouffer Hotel Management operated it. CTF Management Corporation was Stouffer Hotel Management's successor, and the opinion notes that there was "no issue as to CTF's liability for the torts of its predecessor." 719 So.2d at 206 n. 1. Several years after the judgment was entered, the plaintiff moved to have it amended so as to be against the entity that operated the business "`under that trade name.'" 719 So.2d at 207. The trial court amended the judgment by substituting "CTF" for "Stouffer Riverview Plaza Hotel." On appeal, CTF argued that "the complaint was not sufficient to give its predecessor notice that it was an intended defendant." 719 So.2d at 207. This Court concluded that the trial court had not erred in amending the default judgment, pointing out that in Hughes, supra, it had "noted that the Rules of Civil Procedure were designed to give fair notice of the claim against the defendant and that such notice is apparent on the record when the individual served with the complaint and the person doing business by the trade name under which the defendant was identified in the complaint are one and the same."719 So.2d at 208. Under such circumstances, however, there should be "no question as to the identity of the proper defendant." Id.
In Hughes, the Court had held that a judgment against "Hughes Realty of Clanton, Alabama," was enforceable against *Page 216 
"Gearlene Hughes d/b/a Hughes Realty or Hughes Realty of Clanton, Alabama," because the complaint had been personally served on her, because she was the owner of Hughes Realty, and "because the complaint set forth the nature of the relief demanded, the circumstances were such as to give Hughes notice that she was the individual intended to be sued." Hughes, 601 So.2d at 470. TheHughes Court held that "[i]t was incumbent upon her to appear and answer that she had been incorrectly named in the complaint, if she believed that was the case." 601 So.2d at 470.
Applying that reasoning to the circumstances before it, the Court in Ex parte CTF held:
 "Based on the particular facts before us, we conclude that both Riverview Plaza, which was in the business of owning hotels, and Stouffer Hotel Management, which was in the business of managing hotels, did business under the trade name `Stouffer Riverview Plaza Hotel.' We agree with CTF that Hughes did not specifically deal with a situation such as this one. However, even though Hughes dealt with perhaps a more common situation involving an action filed against a defendant named by the trade name of a sole proprietorship, certainly nothing in Hughes
precludes us from holding that when two corporate entities mutually agree to conduct their respective businesses under one trade name, a default judgment entered against a defendant named by that trade name is a judgment against either entity, provided that the entity sought to be bound was properly served with the complaint.
 "Contrary to CTF's assertions, we cannot agree that Riverview Plaza was the only entity closely enough identified with `Stouffer Riverview Plaza Hotel' to be bound by the judgment. In this respect, we point out that the rationale for upholding the judgment in Hughes is equally applicable here. There was no question in Hughes as to the identity of the person intended to be sued; there was no way Gearlene Hughes could not have understood that she was the defendant named in the complaint. In the present case, [the plaintiff] alleged in his complaint that `Stouffer Riverview Plaza Hotel' had on July 19, 1989, unlawfully arrested and imprisoned him and that that alleged wrongdoing had caused him damage. When they received the complaint, it should have been apparent to the on-site representatives of Stouffer Hotel Management that [the plaintiff] had stated claims for damages against the entity or entities doing business under the trade name `Stouffer Riverview Plaza Hotel,' based on the alleged wrongful acts of the hotel's manager. The hotel's manager was an employee of Stouffer Hotel Management. This Court in Hughes
stated that `one doing business in a trade name has fair notice that a complaint alleging a cause of action arising out of his business may lead to personal liability.' 601 So.2d at 471. The record indicates that answers had been filed in numerous other actions (tort actions, workers' compensation actions, and garnishment actions) against `Stouffer Riverview Plaza Hotel' and that those actions were resolved by Stouffer Hotel Management. We find unpersuasive CTF's argument that its predecessor could not reasonably have known that it had been sued."
719 So.2d at 209.
We find similarly unpersuasive Lifestar's argument that it could not reasonably have known that it had been sued. We do not agree with its contention in its brief that "[t]here was simply nothing about the Complaint or Summons filed by Lemuel *Page 217 
which would put Lifestar on notice it was the intended defendant." (Lifestar's brief, p. 44.) Lifestar does not contend that Robertson was not a proper agent for service of process on it, and Rule 4(c)(6), Ala. R. Civ. P., as it read in 2003, allowed, among alternative means for service upon a corporation, service upon "an agent of the corporation." We cannot reject Judge Price's finding, paralleling that in Ex parte CTF, that "it should have been apparent to the on-site representatives of `Lifestar' that the Plaintiff stated a claim for damages against the entity doing business under the name `Care Ambulance Service' based on the alleged wrongful acts of the employees of `Lifestar.'" See 719 So.2d at 209. Even a cursory reading of the complaint would have revealed that the underlying incident involved employees of Lifestar. Lifestar had purchased the corporate name "Care Ambulance Service of Alabama, Inc." from Care, and Care was barred from using that name for any ambulance operations in Alabama; Lifestar did business both as "Care Ambulance Service" and "Care Ambulance." Over the course of several years preceding the Lemuel action, legal papers directed to "Care Ambulance Service of Alabama, Inc." and "Care Ambulance Service" had been accepted for service by Lifestar personnel, including Robertson, at the South Perry Street address. Another action naming "Care Ambulance Service of Alabama, Inc." as the defendant had been served on Vanessa Hill, and Lifestar had filed an answer in the case acknowledging that it did business as "Care Ambulance Service" and explaining that it was "incorrectly designated as Care Ambulance Service of Alabama, Inc." Accordingly, we find no error in Judge Price's decision to allow the default judgment to be amended to designate Lifestar as the entity against whom it operated.
Lifestar argues that the holdings of Ex parte Pate,673 So.2d 427 (Ala. 1995), and Cofield v. McDonald's Corp., 514 So.2d 953
(Ala. 1987), support its position. Those cases, however, are distinguishable. The title of the complaint in Cofield listed McDonald's Corporation as "the only entity named as a defendant,"514 So.2d at 954, and the plaintiff later voluntarily dismissed it from the action. "Rule 10(a), [Ala.] R. Civ. P., requires that a complaint include the names of all parties in the title of the action." 514 So.2d at 953-54. Although it is not clear from the opinion just how two other corporations might have been mentioned in the trial court record, the plaintiff argued that they should have been recognized as defendants "as evidenced by the case action summary sheet." 514 So.2d at 953. This Court held that although the plaintiff might have intended an action against the other two entities, "he did not properly identify them in his complaint." 514 So.2d at 954. Accordingly, this Court upheld the order of the trial court dismissing the action for failure to state a claim upon which relief could be granted.
In Pate, the plaintiff, seeking workers' compensation benefits, sued three specifically identified business entities, serving them by certified mail addressed in care of Mr. Pate, who was not named as an individual defendant. Subsequently, on the day of trial, the plaintiff amended his complaint to substitute two other corporations for fictitiously named defendants, again serving Pate. After ruling in favor of the plaintiff and holding two of the named corporations liable as his general and special employers, respectively, the trial court concluded that the plaintiff "had presented sufficient evidence to pierce the corporate veil" of the two corporations, so as to hold Pate, their president, personally liable. Pate argued on appeal that "he was never named as a defendant, was never served *Page 218 
with a complaint, and was not put on notice before trial of any claim or personal liability against him." 673 So.2d at 428. This Court held that because "Pate was never named as a defendant in his individual capacity," 673 So.2d at 429, and appeared at trial only in his representative capacity, the judgment against him was due to be set aside.
Thus, there was no contention in Cofield that the two entities the plaintiff sought to have recognized as defendants had ever been served with any papers that in any way named them, or in any way described conduct involving them, so as to put either of them on notice that it was an entity intended to be sued. Likewise, the title of the action in Pate never included any form of Pate's name, and he was never put on notice of any claim of personal liability.
We turn next to Lifestar's contention that Judge Price erred in not granting its motion to set aside the default judgment. We agree with Lifestar that its motion was timely under Rule 55(c), Ala. R. Civ. P., because of the filing and pendency of the plaintiff's motion to amend the judgment.
In Kirtland v. Fort Morgan Authority Sewer Service, Inc.,524 So.2d 600 (Ala. 1988), we explained that "when exercising discretionary authority pursuant to Rule 55(c), a trial judge should start with the presumption that cases should be decided on the merits whenever practical." 524 So.2d at 605. We went on to explain, and hold, as follows:
 "The greatest difficulty in deciding whether to grant or to deny a motion to set aside a default judgment arises in those cases falling in the expansive area between the two extremes — one extreme characterized by the presentation of a clearly frivolous defense or no defense at all and by intentional and flagrant abuse of procedural rules, which come together to warrant disposition of the case by default judgment, and the other extreme characterized by inadvertent oversight coupled with an obviously meritorious defense, which come together to warrant disposition by trial. To alleviate the difficulty involved in deciding Rule 55(c) motions and to ensure that justice will be served, clear guidelines need to be established and then implemented by trial courts. Thus, we hold that a trial court's broad discretionary authority under Rule 55(c) should not be exercised without considering the following three factors: 1) whether the defendant has a meritorious defense; 2) whether the plaintiff will be unfairly prejudiced if the default judgment is set aside; and 3) whether the default judgment was a result of the defendant's own culpable conduct. [Ex parte] Illinois Central Gulf [R.R., 514 So.2d 1283 (Ala. 1987)]; Hritz v. Woma Corp., 732 F.2d 1178 (3d Cir. 1984)."
524 So.2d at 605 (footnote omitted).
We now discuss and apply those three factors, originally stated in Kirtland and expounded upon in subsequent cases, as follows:
1. Whether the defendant has a meritorious defense.
In order to demonstrate a meritorious defense, the defendant need not satisfy the trial court that it will necessarily prevail at trial on the merits, only that it is prepared to present a plausible defense, which is a viable legal theory supported by factual basis. Kirtland, 524 So.2d at 605; SummitPhotographix, Inc. v. Scott, 763 So.2d 956, 959 (Ala. 2000). The articulation of the plausible defense must present more than bare legal conclusions without factual support; the statement must set forth relevant legal grounds substantiated by a *Page 219 
credible factual basis. Kirtland, 524 So.2d at 606; Sampson v.Cansler, 726 So.2d 632, 634 (Ala. 1998); Phillips v. Randolph,828 So.2d 269, 273 (Ala. 2002).
As noted, the only assertion Lifestar made in its motion to set aside the default judgment relating to a meritorious defense was that Lifestar, not Care, had provided "[t]he ambulance transportation" to Mr. Lemuel, so that Care "has a very meritorious defense." In Bryan's accompanying affidavit, he stated that he had inferred from the records he referenced and attached to the affidavit that the Lifestar employees had not rendered the medical services to Mr. Lemuel, but rather those medical services had been rendered by "Montgomery Fire Department Fire Medics" who supposedly were "on the scene at the time of arrival" of the Lifestar employees. Bryan's affidavit referenced "Ordinance 25-98, City of Montgomery," but neither his affidavit nor the motion itself quoted the text of that ordinance. Lifestar argued at the July 22 hearing that the Montgomery Fire Department medics were on the scene, that they were "the ones that called us," that they were "the ones that rode in the ambulance with the patient to the hospital," and that they were the ones "who by ordinance [had] exclusive control and jurisdiction over the situation." Even in its briefs to this Court, however, Lifestar does not quote Ordinance 25-98. The plaintiff argues that neither the trial court nor this Court can take judicial notice of the ordinance. (Lemuel's brief, p. 40.) In its reply brief, Lifestar argues, without citation to authority, that because Bryan referenced the ordinance in his affidavit, the trial court could take judicial notice of it. At no time during the July 22 hearing was the text of the ordinance quoted to Judge Price or was he asked to take judicial notice of it. "A circuit court, in the absence of statutory authority, cannot take judicial notice of a municipal ordinance." General Motors Acceptance Corp. v. City ofRed Bay, 825 So.2d 746, 749-50 (Ala. 2002).
Section 11-45-11, Ala. Code 1975, provides that "[a]ll courts of the state of Alabama shall take judicial notice of all municipal ordinances of each Class 1 Municipality." Class 1 municipalities are those with a population of 300,000 inhabitants or more. Ala. Code 1975, § 11-40-12. We take judicial notice of the fact that the population of the City of Montgomery as of the last federal decennial census, taken in the year 2000, was 201, -568. See Meadows v. City of Birmingham, 582 So.2d 603 (Ala.Crim.App. 1991). Accordingly, Judge Price could not take judicial notice of the ordinance under § 11-45-11. Section 12-21-95, Ala. Code 1975, allows for the introduction of properly certified codes or other compilations of municipal ordinances, but no such document was offered before Judge Price. Finally, Rule 9(d), Ala. R. Civ. P., provides: "In pleading an ordinance of a municipal corporation . . . it is sufficient to refer to the ordinance . . . by its title and the date of its approval, and the court shall take judicial notice thereof." Although Bryan referred to the ordinance "by its title" in his affidavit, he did not include the date of its approval. Consequently, we cannot hold that Judge Price was obligated to take, and therefore must have taken, judicial notice of the text of the ordinance. The plaintiff includes a copy of the ordinance as an appendix to her brief, for our use if we elect to consider it, stating, however, that "its submission is similarly improper" before this Court as would have been Judge Price's judicial notice of it.
Lifestar argues in its principal brief concerning the ordinance as follows: *Page 220 
 "Pursuant to Ordinance 25-98, City of Montgomery, the Montgomery Fire Department Fire Medics were in charge at the scene at the Lemuel home and in charge of all matters concerning patient care and transport. Under protocol, the Lifestar ambulance crew did not perform the medical care criticized by Lemuel in her Complaint. The protocol required by the Montgomery City Ordinance was followed on the occasion of the 911 emergency call to the Lemuel home. . . . Additional support for this fact is found in the Care Ambulance Statistical Data Report and Care Ambulance Run Report attached as Exhibit A to Bryan's Affidavit . . . wherein it is noted, `MFD' (Montgomery Fire Department) is listed as providing medical control on scene and en route. . . . The Lifestar EMT's report states they `carried out orders in route to [Baptist Medical Center]-South for further [treatment]'. . . . Since the Lifestar employees did not render EMT medical services to Lemuel, such services being provided by the Montgomery Fire Department Fire Medics, Lifestar could not be legally liable for the acts of neglect made the basis of the Lemuel Complaint."
Thus, Lifestar's meritorious defense is dependent upon the text of Ordinance 25-98 and upon Lifestar's assertion that Montgomery Fire Department medics were at the scene at the Lemuel home and that Lifestar's employees did not render emergency medical services to Mr. Lemuel. Even if we consider the protocol established by the ordinance, as Lifestar invites us to do, the showing of a meritorious defense falls short.
Section 11 of the ordinance, entitled "PROTOCOL," reads as follows:
 "To facilitate the most efficient transfer of patient care, the following procedures have been adopted:
 "A. Upon arrival at the scene of an incident where patient care is being provided by Fire Department personnel, the ambulance crew shall:
 "1. Seek out the officer or Firemedic in charge for any information reports on patient care already provided (at no time shall patient care be interrupted);
 "2. Request possible assignments to assist in any additional care;
 "3. Avoid duplicating any patient assessment or treatment already completed;
 "4. Work under the direction of the officer or Firemedic in command of the scene.
 "B. Upon arrival at the scene of an incident where patient care is currently being provided by ambulance crew personnel, the Fire Department may assume command of the scene. In the event that the Fire Department does assume command of the scene they shall:
 "1. Seek out the ambulance attendant in charge for a report on the condition of the patient, and any treatment that may have been provided (at no time shall patient care be interrupted);
 "2. Request transfer of information from ambulance crew;
"3. Remain in charge of the scene while at the scene;
 "4. Avoid duplicating any patient assessment or treatment already completed;
 "At no time shall personnel delay initiation of appropriate treatment or transportation of a patient in anticipation of Fire Department response. It is the responsibility of all agencies providing patient care to cooperate and assist in *Page 221 
treatment and transportation requirements."
Bryan asserted in his affidavit that his review of the records referenced therein revealed that the Montgomery Fire Department medics were on the scene when the Lifestar employees arrived and that the Montgomery Fire Department medics provided all medical treatment to Mr. Lemuel, being in charge in that regard under the protocol mandated by the ordinance. The only portion of those records Lifestar cites in its brief as in any way supporting Bryan's conclusions is the appearance of the initials "MFD" at a point on the statistical data report prepared by Care Ambulance. As already noted, none of the three records attached to Bryan's affidavit were mentioned during the hearing before Judge Price, and certainly no one attempted to call Judge Price's attention to, or suggest the meaning of, the initials "MFD" on one of those records. Nowhere in any of those records does there appear any other statement that could be interpreted as referring to the involvement of Montgomery Fire Department personnel in treating Mr. Lemuel. Even assuming "MFD" to be a reference to the Montgomery Fire Department, Judge Price would have had no basis for determining when fire department personnel arrived on the scene, whether they assumed command, and who rendered what services. If Care Ambulance arrived on the scene first, it was obligated under the protocol not to delay initiation of appropriate treatment of Mr. Lemuel in anticipation of a response by the fire department.
The transcript of the May 28, 2003, hearing reveals that Ms. Lemuel and Ms. McDonald testified that two paramedics from Care Ambulance were the first and, for all that appears from their testimony, only personnel to arrive on the scene, appearing within two to three minutes after the emergency 911 call. Ms. Lemuel and Ms. McDonald testified that after the two Care Ambulance "paramedics" arrived, Mr. Lemuel began to experience what the paramedics stated were seizures and his lips turned blue. Both witnesses were emphatic that, although the paramedics remained on the scene for about 30 minutes, they brought no equipment into the house, they administered no oxygen to Mr. Lemuel, they never tested Mr. Lemuel's blood pressure, they never took his vital signs, and they never started an IV.
Dallas Johnson, the plaintiff's expert witness, is an inspector/investigator assigned to the fire marshall's office, a paramedic, and a captain with the Prattville Fire Department. He serves from time to time as a "credentialing proctor" for the State to test students "to see that they comply with protocol," and he instructs basic emergency medical training at a technical college. Various written procedures and protocols were introduced into evidence in connection with his testimony. Based on the testimony of Ms. Lemuel and Ms. McDonald and on those protocols, Johnson expressed his opinion that the ambulance personnel had been guilty of gross negligence in a number of particulars, including the failure to administer oxygen on the scene and the failure to monitor Mr. Lemuel's blood-oxygen saturation. Johnson testified that the ambulance personnel should have established an IV and should have tested Mr. Lemuel's blood sugar with a glucometer. Once Mr. Lemuel began experiencing seizures, they should have proceeded under "the seizure protocol," involving continued oxygen therapy and the intravenous administration of diazepam or Valium.
The hospital records, introduced at the hearing, reflect that Mr. Lemuel was in grave condition when he arrived at Baptist Medical Center South on November 9 *Page 222 
shortly after midnight. It was determined that he had experienced a hemorrhagic cardiovascular accident and was soon placed under "do not resuscitate" orders. With family permission, all life-support measures were discontinued and Mr. Lemuel was declared to be brain-dead the morning of November 10. Johnson testified that proper administration of oxygen to Mr. Lemuel upon arrival of the ambulance personnel was mandatory and that the longer he was without oxygen the greater the damage to his brain. Johnson testified: "The brain begins to suffer permanent damage within just a few minutes of being without oxygen . . . so it is important that oxygen be given at high concentration levels, and we are trying to obtain a 100% oxygen to the patient to minimize that damage." According to Johnson, because Mr. Lemuel had had a cardiovascular accident and a seizure, the failure to administer oxygen and Valium by way of an IV increased the likelihood of brain damage. Johnson characterized the care provided by the Lifestar personnel as "more of the type of care that would have been given back in the 60's when the funeral homes ran the EMS services. They basically arrived on the scene, put you in a bag and carried you, and no care was given."
At the conclusion of the May 28 hearing, Judge Price made the express finding "that the conduct of Care Ambulance and its employees was gross negligence of the worst kind" and that their "egregious conduct" warranted a punitive-damages award of $5,000,000.
Considering all of the information available to Judge Price at the time of the subsequent July 22 hearing, we cannot conclude that he exceeded his discretion in determining that Lifestar, separate from Care, had failed to show that it had a meritorious defense. Lifestar argues in its brief, "Notably absent from the testimony of either of these ladies [at the May 28 hearing] is the fact that Montgomery Fire Department Fire Medics were on the scene and actually administered the medical treatment to Mr. Lemuel." (Lifestar's brief, p. 14.) We can only comment that notably absent from the record in this case is any evidentiary corroboration for that assumption. Whatever weight Judge Price should have given the inferences Bryan drew from the records concerning the presence of Montgomery Fire Department medics, Judge Price was at liberty to find that information rebutted and overcome by the testimony of Ms. Lemuel and Ms. McDonald.
Lifestar also argues in its principal brief that "[a] second meritorious defense is the insufficiency of service of process on Care." (Lifestar's brief, p. 35.) Insufficiency of service, while relevant to a claim that a default judgment is void for want of jurisdiction, is not relevant to an assertion of the existence of a meritorious defense, i.e., a plausible defense on the merits that "would constitute a complete defense to the action" if proven at trial, or otherwise "warrants submission of the case to the jury." Kirtland, 524 So.2d at 605-06.
2. Whether the plaintiff will be unfairly prejudiced if the default judgment is set aside.
In Phillips, supra, we recognized that we had not previously "specifically addressed the question of who, in a motion to set aside a default judgment, has the burden of showing that the plaintiff would not be unfairly prejudiced if the motion is granted and the default judgment is set aside." 828 So.2d at 278. We concluded:
 "[W]hen a party files a motion to set aside a default judgment, the movant has the initial burden of making a prima facie showing that the plaintiff will not be unfairly prejudiced if the default *Page 223 
judgment is set aside. If the movant makes a prima facie showing that the plaintiff will not be unfairly prejudiced, the burden then shifts to the plaintiff to present facts showing that the plaintiff will be unfairly prejudiced if the default judgment is set aside."
828 So.2d at 278.
In its motion to set aside the default judgment, Care asserted in conclusory form, "There is no evidence that was available prior which is not available now. No witness is believed to have died in the meantime between the entry of the judgment and the time when additional and thorough and comprehensive discovery would be conducted on the merits of the allegations of the complaint." In Lifestar's motion to set aside the default judgment, it took no note whatsoever of this Kirtland factor. At the July 22, 2003, hearing, neither Care nor Lifestar offered any evidence or argument relating to the issue of prejudice to the plaintiff by the setting aside of the default judgment. Accordingly, we have no basis for concluding that Judge Price exceeded his discretion in concluding that Lifestar had failed to make the requisite showing of this factor.
 "In this case, the defendants' motion to set aside the default judgment makes no statement that [the plaintiff] would not be unfairly prejudiced if the default judgment was set aside. In light of Phillips [v. Randolph, 828 So.2d 269 (Ala. 2002),] we conclude that the defendants failed to meet their initial burden of showing that [the plaintiff] would not be prejudiced by setting aside the default judgment and thus failed to make the requisite showing under the second Kirtland
factor."
Triple D Trucking, 840 So.2d at 874.
3. Whether the default judgment was the result of the defendant's own conduct.
In addition to the general proposition noted in Kirtland that "[o]n review, a trial court's decisions should be looked upon with great deference," 524 So.2d at 608, we explained in Jonesv. Hydro-Wave of Alabama, Inc., 524 So.2d 610, 616 (Ala. 1988), and reaffirmed in Phillips, 828 So.2d at 279, that "due to the trial judge's superior vantage point, the trial court is the more suitable arbiter for determining with accuracy the culpability of the defaulting party's conduct, and, for this reason, we will show great deference toward the trial court's decision with respect to such culpability."
In Kirtland we stated:
 "Conduct committed willfully or in bad faith constitutes culpable conduct for purposes of determining whether a default judgment should be set aside. Negligence by itself is insufficient. . . . Willful and bad faith conduct is characterized by incessant and flagrant disrespect for court rules, deliberate and knowing disregard for judicial authority, or intentional nonresponsiveness."
524 So.2d at 607-08. A defaulting party's "reasonable explanation for inaction and noncompliance may preclude a finding of culpability." 524 So.2d at 608.
Lifestar acknowledges that the summons and complaint were routed to its home office but simply says that "from there" it is unclear where they went. In DaLee v. Crosby Lumber Co.,561 So.2d 1086, 1091 (Ala. 1990), we stated:
 "In McDavid v. United Mercantile Agencies, Inc., 248 Ala. 297, 301, 27 So.2d 499, 503 (1946), the Court set out the duty of a party when legal process is duly served upon him:
 "`It is the duty of every party desiring to resist an action or to participate in a judicial proceeding to take *Page 224 
timely and adequate steps to retain counsel or to act in his own person to avoid an undesirable judgment. Unless in arranging for his defense he shows that he has exercised such reasonable diligence as a man of ordinary prudence usually bestows upon important business, his motion to set aside a judgment for default should be denied. Little v. Peevy, [238 Ala. 106, 189 So. 720 (Ala. 1939)].
 "`Courts cannot act as guardian for parties who are grossly careless of their own affairs. All must be governed by the laws in force, universally applied, according to the showing made.
 "`If judgment be entered against a party in his absence, before he can be relieved of the judgment he must show that it was the result of a mistake or inadvertence which reasonable care could not have avoided, a surprise which reasonable precaution could not have prevented, or a negligence which reasonable prudence could not have anticipated.'"
See also Phillips, 828 So.2d at 279.
Certainly it would have been apparent to Vanessa Hill, as well as to subsequent recipients of the complaint at Lifestar's home office, that the incident described in the complaint necessarily served to identify Lifestar as the entity intended to be sued. As noted, only a few months before Ms. Lemuel filed her action, the summons and complaint for another wrongful-death action against "Care Ambulance Service of Alabama, Inc." had been served on Vanessa Hill, and Lifestar had answered the complaint, identifying itself as doing business as "Care Ambulance Service" and explaining that it had been "incorrectly designated in the complaint as Care Ambulance Service of Alabama, Inc." Lifestar obviously received and processed Judge Price's May 16 order setting a hearing on damages for May 28. That was established by the explanation in Care's motion to set aside the default judgment and the attached copy of that order bearing imprinted "fax" routing information showing that it had been faxed to Care from the Montgomery office of Lifestar on May 29, 2003. Even if it is assumed that the May 16 order was not forwarded to Lifestar's Montgomery office until after it was filed with the circuit clerk on May 22, Lifestar has made no attempt to account for why it delayed forwarding notice of the hearing to Care until the day after the scheduled hearing. Lifestar took no action other than to have one of its representatives telephone Halstrom on June 3, 2003, to advise him that the default judgment had been taken against the wrong party. When Lifestar finally filed a motion to set aside the judgment, it made no attempt to invoke the Kirtland factors except to argue that Care had a meritorious defense. At the July 22, 2003, hearing, Lifestar offered no evidence in support of the Kirtland factors other than to argue that Lifestar had provided no medical services to Mr. Lemuel. Concerning its supposed lack of culpability, Lifestar argued only that it had never been put on notice that it might be the entity involved in the Lemuel incident.
Given the "great deference" we are obliged to accord Judge Price's decision concerning culpability, we cannot say that he exceeded his discretion in finding as he did.
Having analyzed the application of all three of the Kirtland
factors in the context of the development of those factors before Judge Price, we cannot say that Judge Price exceeded his discretion in concluding that Lifestar was not entitled to have the default judgment set aside. *Page 225 
We turn last to Lifestar's contention that the amount of the default judgment was excessive. Lifestar acknowledges that it did not assert excessiveness at the trial court, but it seeks to benefit from the fact that that issue "was briefed and argued by Care at the hearing." (Lifestar's brief, p. 46.) The argument Care "briefed" and presented in its motion to set aside the judgment, however, was that, because the purpose of punitive damages is to deter wrongful conduct and to punish those responsible for wrongful conduct, it was deserving of no such punishment because it was not the entity that provided the medical treatment to Mr. Lemuel. Further, it asserted:
 "Care of Alabama is informed by the actual transporter, Lifestar[,] that the condition from which Mr. Lemuel ultimately died was such that no reasonably prudent emergency transport team and/or member would have been expected to thwart. In other words, it is believed that the unfortunate consequence of Mr. Lemuel's condition was going to be death no matter the care offered by the ambulance team. Stated another way, certainly the actions of this defendant are not causally related to Mr. Lemuel's death since it had no connection therewith, but in addition it would appear that Lifestar's actions were also not culpable. Facts relating to these issues have not been able to be developed through discovery and presented to the Court and would give grounds to another `meritorious defense' under Kirtland [v. Fort Morgan Authority Sewer Service, Inc., 524 So.2d 600 (Ala. 1988)]."
Lifestar argues to this Court that there was no medical evidence presented to Judge Price at the damages hearing to "substantiate the cause of death as being a breach of the standard of care by the medics providing service at the scene and in route to the hospital." (Lifestar's brief, p. 47.) Given the testimony of Dallas Johnson at the damages hearing, we cannot agree with that contention.
This Court and the Legislature have established a constitutionally appropriate system for reviewing a contention that a punitive-damages award is excessive. See Hammond v. Cityof Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v.Hornsby, 539 So.2d 218 (Ala. 1989); and § 6-11-23(b), Ala. Code 1975. Additionally, the United States Supreme Court has established various "guideposts" and considerations for assessing whether punitive damages are excessive, in a series of cases including, most notably, BMW of North America, Inc. v. Gore,517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Lifestar would have been entitled to a Hammond-Green Oil hearing if it had properly requested one, but a trial judge does not err in not conducting a hearing on punitive damages if no such hearing is requested. Phillips, 828 So.2d at 279. Lifestar says in its brief that "[a]dmittedly, no Hammond-Green Oil hearing was held," but goes on to argue that "[w]ithout getting into theHammond-Green Oil, BMW, and § 6-11-23(b), Code of Alabama, requirements," this Court should, on its own initiative, conduct an independent review of the punitive damages awarded in this case. A Hammond-Green Oil hearing was available to Care and Lifestar; they simply made no effort to present any evidence or argument relating to the factors and criteria developed by caselaw for reviewing punitive damages, other than as incidentally presented in connection with the Rule 55(c), Ala. R. Civ. P., and Rule 60(b), Ala. R. Civ. P., arguments noted above. Likewise, no separate argument was presented with respect to any of the BMW "guideposts." In now asserting that "[t]his Court is charged with the duty of *Page 226 
conducting its own review of punitive damages," Lifestar cites only Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524,532 (Ala. 1997). That case stands for the proposition that we will conduct our own review of a punitive-damages award if the issue of excessiveness has been properly presented to the trial court; we do not, however, review a punitive-damages award for excessiveness where the issue has not been properly raised before the trial court.
Because of the procedural and evidentiary deficiencies infecting Lifestar's claim that the punitive-damages award was excessive, we are in no position independently to assess the constitutional propriety of that award.
 Conclusion
Having considered all of the issues raised on appeal by Lifestar and all of its supporting arguments and cited legal authorities, we conclude (1) that the default judgment entered on May 29, 2003, is not due to be set aside as void for insufficiency of service; (2) that Lifestar received sufficient notice of the fact that it was the entity intended to be sued in the action, so that amendment of the judgment to identify it as the defendant and judgment debtor does not represent a change of parties or deprive Lifestar of its right to due process; (3) that Judge Price did not exceed his discretion, under the Kirtland
test, in refusing to set aside the default judgment; and (4) that Lifestar has failed to present for appellate review its claim of excessiveness of the punitive-damages award. The judgment is affirmed.
AFFIRMED.
NABERS, C.J., and SEE, BROWN, and STUART, JJ., concur.